[No. B109904. Second Dist., Div. Three. Dec. 1, 1997.]

NORTH AMERICAN CHEMICAL COMPANY, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
TRANS HARBOR, INC., et al., Real Parties in Interest.

**COUNSEL**

Haight, Brown & Bonesteel, Thomas N. Charchut, William O. Martin, Jr., and Daniel J. Kelly for Petitioner.

No appearance for Respondent.

Sims, Morrow & Manning, Patrick J. Manning and Selim Mounedji for Real Parties in Interest.

**OPINION**

**CROSKEY, Acting P. J.**—Petitioner, North American Chemical Company (North American), seeks a writ of mandate to compel the restoration of a cause of action for negligence to the complaint which it has filed against the real parties in interest, Trans Harbor, Inc. and Pac III Partners, doing business as Harbor Pac, a joint venture (collectively, Harbor Pac). The trial court sustained Harbor Pac's demurrer to that cause of action without leave to amend.

In its complaint, North American sought recovery of sums it paid as damages in settlement of a customer's claim that arose from a contaminated North American product packaged and shipped for North American by Harbor Pac. Harbor Pac contends that North American can state no claim for negligence, but only one for a breach of contract. North American responds that it is entitled to pursue both remedies until such time as an election may be required by law. The issue is important as it impacts both the applicable statute of limitations and the proper measure of damages. Harbor Pac also raises the objection that North American is claiming only an economic loss and such damages are not recoverable in the absence of physical injury to person or property.

We hold that North American's packaging and shipping contract with Harbor Pac imposed a duty on Harbor Pac which required it to reasonably

and carefully perform its contractual obligations; it is this duty North American has alleged was breached. In addition, because this case arises from a contract for the performance of services rather than the sale of goods, and the negligent performance of that contract allegedly resulted in a *foreseeable* economic loss to North American, the so-called "economic loss rule" does not bar recovery even though (1) the only damages that North American seeks are based solely on economic loss and (2) contractual privity is present. As a result, we conclude that North American has stated a viable cause of action for negligence.[1] We therefore will grant the requested writ.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

On or about February 1, 1993, North American, a manufacturer of a large variety of chemicals, including boric acid, entered into an oral agreement with Harbor Pac in which Harbor Pac agreed to bag, containerize and transport chemicals to North American's customers at a fixed price per short ton. This agreement was confirmed in writing by Harbor Pac in a letter dated February 5, 1993. By its terms, the agreement was effective through December 31, 1993.

On or about May 20, 1993, North American shipped approximately 46 metric tons of bulk boric acid to Harbor Pac from its facility in Trona, California. The shipment was accompanied by bills of lading which provided that Harbor Pac was to package and seal the boric acid into one-ton Flecon bags. The packaged boric acid, as reflected in the bills of lading, was destined for ultimate delivery to North American's customer, N. H. Techno Co., Ltd. (NHT), in Nagoya, Japan. In accordance with the terms of its contract with North American, Harbor Pac received the bulk boric acid on May 21, 1993, and packaged and sealed it. Unfortunately, Harbor Pac utilized the same silo that had previously been used to package a product known as "V-bor," and North American's boric acid became contaminated. Harbor Pac shipped the sealed one-ton bags to Japan on May 23 and May 30, 1993. The last part of that shipment arrived in Japan on June 11, 1993.

NHT produces specialty glass for thin filter resistors, a key component of liquid crystal displays. It began using North American's boric acid in its manufacturing process on or about October 12, 1993. Within two weeks, it discovered that the boric acid was contaminated with V-bor and it was

---

[1]As we explain below, it appears that North American has also alleged sufficient facts (or will be able to do so upon remand) to state a related cause of action for negligent interference with prospective economic advantage.

[2]The facts upon which we rely are those alleged in North American's second amended complaint. As this case comes to us upon demurrer, we accept the allegations of fact contained in that pleading as true. (See fn. 4, *post.*)

forced to stop production for approximately twelve days. A provisional claim for damages in the sum of $254,600 was submitted by NHT to North American on or about October 25, 1993. A formal demand by NHT for payment of this sum was made two weeks later on November 8. After some investigation by North American and negotiation with NHT, it was agreed on December 27, 1993, that North American would pay $203,550 (by way of a credit on future product) to compensate NHT for the damages and loss caused by the contaminated boric acid. North American alleges that it "was required" to make such payment and we infer from such allegation that it intends to offer evidence that it agreed to do so in order to protect its own interests and in the good faith belief that it would otherwise be held liable for all of NHT's claimed losses.[3]

On January 28, 1994, North American provided documentation supporting the damages claimed by NHT to Harbor Pac together with a demand for payment of that claim. North American asserted that it was Harbor Pac, not North American, which had caused the boric acid to become contaminated with V-bor and this was the direct and legal cause of NHT's loss. Harbor Pac (and its insurer) ignored North American's claim and demand for payment. As a result, North American filed this action on June 9, 1995. After certain law and motion proceedings, North American filed its second amended complaint on October 24, 1996. In that pleading, which is the one before us, North American alleged[4] that Harbor Pac had held itself out as qualified to properly bag, containerize and transport bulk chemical products and that its

---

[3]We cannot determine from the record whether, and to what extent, NHT's damage claim was one for which North American was legally liable. This is a matter which will have to be resolved at trial when North American presents its evidence of damages. However, we assume, for purposes of this opinion, that NHT's damages included those authorized under the California Uniform Commercial Code for a breach of warranty as to product quality. (See Cal. U. Com. Code, §§ 2714 and 2715.)

[4]Specifically, in its third cause of action for negligence, North American alleged:

"29. Defendants and each of them held themselves out to the general public, including [North American], as qualified and equipped to bag, containerize and transport bulk chemical products. In doing so, defendants and each of them impliedly represented that they possessed the skill, knowledge and expertise to bag, containerize and transport [North American's] products with the skill, prudence and diligence commonly exercised by members of their trade.

"30. In delivering the subject shipment of boric acid to defendants and each of them, [North American] relied upon their skill and expertise in bagging, containerizing and transporting bulk chemical products. By virtue of the relationship between [North American] and defendants and each of them and in accordance with the duties arising out of the contact between [North American] and Harbor Pac, defendants and each of them owed a duty to [North American] to exercise due care in bagging, containerizing and transporting the subject shipment of boric acid. NHT was a third party beneficiary of this contract.

"31. The purpose of [North American's] contract with defendants was the packaging and delivery of the subject of boric acid to the Port of Long Beach for transport to NHT in Nagoya, Japan. In this undertaking, defendants and each of them were bound to use the skill,

failure to do so, i.e., to carry out its contract with North American in a reasonable and professional manner, constituted negligence for which Harbor Pac was liable.[5]

Harbor Pac demurred to the negligence cause of action, arguing that it was liable, if at all, only for breach of contract. It argued to the trial court that North American was attempting to convert what was at most a contract breach into a tort and this was not legally permissible. In addition, Harbor Pac argued that it could not be held liable for a claimed loss by North American which consisted solely of economic damages. The trial court agreed and sustained Harbor Pac's demurrer to the third cause of action without leave to amend.

North American has sought relief by writ of mandate in this court. On April 3, 1997, we issued an alternative writ and set the matter for hearing.

## ISSUES PRESENTED

There are essentially two issues presented by North American's petition: (1) Can the negligent performance of a contractual obligation give rise to an action in tort? (2) Is North American entitled to recover under a negligence theory for injury solely to its economic interests without any need to allege or prove injury to person or property? We answer both of these questions in the affirmative.

---

prudence and diligence commonly exercised by practitioners of their trade in the bagging, containerizing and transporting process. Inherent in this duty is the obligation to exercise reasonable care so that the boric acid is not contaminated, adulterated, damaged or mislabeled.

"32. Defendants and each of them negligently failed to exercise reasonable care in the bagging, containerizing and transporting process and thereby caused the subject shipment to be contaminated, adulterated, damaged or mislabeled on or about May 21, 1993. This conduct fell below the applicable standard of care.

"33. As a legal result of the negligent conduct and failure to exercise due care of defendants and each of them, [North American] has been damaged in the sum of $203,500. [North American] was required to pay NHT this sum as a direct and legal result of the delivery of contaminated, adulterated, damaged or mislabeled boric acid to NHT for use in its manufacturing process."

[5]North American's complaint does not directly allege that Harbor Pac knew or should have known that (1) maintenance of the purity of the boric acid was a critical aspect of North American's commercial agreement with NHT and (2) a failure to maintain such purity in the packaging and shipping process reasonably could result in substantial damages to NHT for which North American might be held responsible. However, these are allegations which North American's written and oral arguments indicate can be added and, assuming they can be truthfully pled, may be set forth in an amendment to the complaint upon remand.

## DISCUSSION

### 1. *Standard of Review*

■ As already noted, we are reviewing an order of the trial court sustaining a demurrer without leave to amend. "In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.]" (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) Irrespective of the labels attached by the pleader to any alleged cause of action, we examine the factual allegations of the complaint, to determine whether they state a cause of action on *any* available legal theory. (*Ellenberger* v. *Espinosa* (1994) 30 Cal.App.4th 943, 947 [36 Cal.Rptr.2d 360]; *Saunders* v. *Cariss* (1990) 224 Cal.App.3d 905, 908 [274 Cal.Rptr. 186].) If they do, then the trial court's order of dismissal must be reversed. (*Platt* v. *Coldwell Banker Residential Real Estate Services* (1990) 217 Cal.App.3d 1439, 1444 [266 Cal.Rptr. 601].)

■ Where, as here, the court has sustained a demurrer to only one of several causes of action, its order is not appealable. Review by mandamus is the appropriate way to control judicial discretion where that discretion has been abused. (*La Jolla Village Homeowners' Assn.* v. *Superior Court* (1989) 212 Cal.App.3d 1131, 1140 [261 Cal.Rptr. 146].) We thus consider de novo whether the trial court's ruling has deprived North American of the opportunity to plead a cause of action. If it has, it has abused its discretion. (*Ibid.*) Abuse of discretion exists when the trial court has committed substantial error which is clearly prejudicial. Such prejudicial error is present when a court improperly prevents a party from pleading a substantial part of its case. (*Angie M.* v. *Superior Court* (1995) 37 Cal.App.4th 1217, 1223 [44 Cal.Rptr.2d 197].) Under such circumstances, relief by mandamus is appropriate " 'to prevent a needless and expensive trial and reversal.' [Citation.]." (*Holtz* v. *Superior Court* (1970) 3 Cal.3d 296, 301, fn. 4 [90 Cal.Rptr. 345, 475 P.2d 441].)

### 2. *A Contractual Obligation May Create a Legal Duty the Breach of Which Will Support an Action in Tort*

■ Harbor Pac's principal argument is that whatever its contractual liability to North American may be, it cannot be held liable in tort for

negligence. It is certainly true that contract and tort are different branches of the law. ▮ Contract law exists to enforce the intentions of the parties to an agreement while tort law is designed to vindicate social policy. (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 683 [254 Cal.Rptr. 211, 765 P.2d 373].) However, the same wrongful act may constitute both a breach of contract and an invasion of an interest protected by the law of torts. (3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 139, pp. 203-204.)

This court recently endorsed the general rule that where the "negligent" performance of a contract amounts to nothing more than a *failure* to perform the express terms of the contract, the claim is one for contract breach, not negligence. (*Wilmington Liquid Bulk Terminals, Inc.* v. *Somerset Marine Inc.* (1997) 53 Cal.App.4th 186, 195 [61 Cal.Rptr.2d 727].) However, for over 50 years California has also recognized the fundamental principle that " '[a]c-companying every contract is a common-law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of the contract.' The rule which imposes this duty is of universal application as to all persons who by contract undertake professional or other business engagements requiring the exercise of care, skill and knowledge; the obligation is implied by law and need not be stated in the agreement [citation]." (*Roscoe Moss Co.* v. *Jenkins* (1942) 55 Cal.App.2d 369, 376 [130 P.2d 477]; see also *Kuitems* v. *Covell* (1951) 104 Cal.App.2d 482, 485 [231 P.2d 552].)[6] Both *Roscoe Moss Co.* and *Kuitems* involved contracts for the performance of services rather than the sale of goods. As we discuss below, that is an important distinction. A contract to perform services gives rise to a duty of care which requires that such services be performed in a competent and reasonable manner. A negligent failure to do so may be both a breach of contract and a tort. (*Perry* v. *Robertson* (1988) 201 Cal.App.3d 333, 340 [247 Cal.Rptr. 74].) In such a hybrid circumstance, the plaintiff is entitled to pursue both legal theories until an occasion for an election of remedies arises. (*Ibid.*)

---

[6]Indeed, the Supreme Court recognized this basic principle over 100 years ago in *Sloane* v. *Southern Cal. Ry. Co.* (1896) 111 Cal. 668 [44 P. 320]. In that case, a passenger who had purchased a railroad ticket to San Diego and had been wrongfully ejected from the train before her destination sued the defendant railroad for damages in tort. In response, the railroad contended that the passenger's "only right of action is for breach of the defendant's contract to carry her to San Diego, and that the extent of her recovery therefor is the price paid for the second ticket, and a reasonable compensation for the loss of time sustained by her." (*Id.* at p. 676.) The *Sloane* court rejected the defendant's contention, declaring that "[t]he plaintiff's right of action . . . is not . . . limited to the breach of [the] contract to carry her to San Diego, but includes full redress for the wrongs sustained by her by reason of the defendant's violation of the obligations which it assumed in entering into such contract. . . . [S]he could either bring an action simply for the breach of this contract, or she would sue . . . in tort for [defendant's] violation of the duty . . . which it assumed upon entering into such contract." (*Id.* at pp. 676-677.)

In the leading case of *Eads* v. *Marks* (1952) 39 Cal.2d 807 [249 P.2d 257], the plaintiff's parents had contracted with the defendant creamery for the delivery of milk to their home. Due to plaintiff's young age, special instructions were given to defendant regarding the placement of milk bottles. The defendant negligently failed to follow those instructions resulting in plaintiff's injury. The Supreme Court recognized that "[e]ven where there is a contractual relationship between the parties, a cause of action in tort may sometimes arise out of the negligent manner in which the contractual duty is performed, . . ." (*Id.* at p. 810.) As the court explained, "The contract is of significance only in creating the legal duty, and the negligence of the defendant should not be considered as a breach of contract, but as a tort governed by tort rules. [Citations.] As was said in *Peterson* v. *Sherman* [(1945) 68 Cal.App.2d 706, 711 [157 P.2d 863]]: 'It has been well established in this state that if the cause of action arises from a breach of a promise set forth in the contract, the action is ex contractu but if it arises *from a breach of duty growing out of the contract* it is ex delicto. . . .' [Citation.] Where the cause of action arises from the breach of a contractual duty, the action is delictual notwithstanding that it also involves a breach of contract.' [Citation.]" (*Id.* at p. 811; see also *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 175 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314].) ■ In general, it has been held that an action based on the negligent performance of contractual duties, although involving elements of both contract and tort, is regarded as a delictual action, since negligence is considered the gravamen of the action. (*Eads* v. *Marks*, *supra*, 39 Cal.2d at pp. 811-812; see also *Distefano* v. *Hall* (1963) 218 Cal.App.2d 657, 678 [32 Cal.Rptr. 770].)

In a case that is factually very close to the one before us, the court applied these principles and found the tort remedy available. In *Allred* v. *Bekins Wide World Van Services* (1975) 45 Cal.App.3d 984 [120 Cal.Rptr. 312], plaintiff had been employed on a West Pakistan construction project. Upon its completion, his employer entered into a contract with the defendant Bekins to transport plaintiff's personal belongings back to the United States. Bekins negligently packed plaintiff's property in rancid and contaminated straw which subsequently resulted in damage to plaintiff's property and personal injury to plaintiff and members of his family. While plaintiff did not contract directly with Bekins, he acquired enforceable contractual rights by virtue of his obvious status as an intended third party beneficiary of his employer's contract with Bekins. (See generally, *Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 589-591 [15 Cal.Rptr. 821, 364 P.2d 685]; BAJI No. 10.59.) The *Allred* court had no trouble concluding that plaintiff's complaint, alleging the facts summarized above, pleaded the negligent violation of a contractually created legal duty owed by Bekins to plaintiff which proximately resulted in

property damages and bodily injuries to plaintiff and his family. The court stated, "The purpose of Bekins' contract with the employer[] was the delivery of the Allred family's goods to their home in the United States. In this undertaking Bekins was bound, as a matter of law, to use at least reasonable care and skill. [Citations.] And: ' "[N]egligent failure to observe [such] conditions is a tort, as well as a breach of the contract." The rule which imposes this duty is of universal application as to all persons who by contract undertake professional or other business engagements requiring the exercise of care, skill and knowledge; the obligation is implied by law and need not be stated in the agreement. . . .' [Citation.]" (45 Cal.App.3d at p. 989.)

■■■ Harbor Pac asserts that the decision in *Allred* is inapplicable to the facts of this case. It argues that *Allred* involved personal injuries and property damage and not the purely economic loss claimed here; and it was NHT which suffered property damage in this case, not North American.[7] However, that argument really goes to the damage issue which we discuss below. *Allred* is important here because it provides a closely analogous application of the general rule which we apply that a tort remedy may arise from the negligent performance of a contractual commitment.

In essence, Bekins contracted to pack and ship goods. It performed that contract in a negligent manner and caused damage to one of the parties entitled to enforce the contract. It is of no significance that the plaintiff in *Allred* was a third party beneficiary. That status simply gave him a right to claim the benefit of Bekins's contractual promise which, as we have shown, necessarily included the legally imposed duty to perform with due care. Bekins's failure to do so gave rise to a cause of action for negligence in favor of one of the "contracting" parties.

In accordance with these well-established principles, we conclude that North American's contract with Harbor Pac imposed upon the latter a duty of reasonable care in carrying out and performing that contract.

---

[7]This is not really accurate. When Harbor Pac allowed the boric acid (which at the time was obviously still the property of North American) to become contaminated, it thereby caused physical damage to the boric acid which damage led directly to the injuries sustained by NHT which in turn led to NHT's claim against North American. However, it is claimed, Harbor Pac did more than simply cause damage to the boric acid; it then shipped the contaminated product to North American's customer with the actual or constructive knowledge that the product was no longer suitable for its intended purpose. While North American could have limited its claim to the physical damage caused to the bulk boric acid, such claim would doubtless be only a fraction of its real loss. It is for that reason that it is critical to North American's position in this appeal that it recover for the economic losses represented by its alleged liability to NHT.

### 3. The "Economic Loss" Rule Does Not Apply in Cases Involving the Negligent Performance of Services That Results in Foreseeable Economic Loss

The economic loss[8] rule has been applied to bar a plaintiff's tort recovery of economic damages unless such damages are accompanied by some form of *physical* harm (i.e., personal injury or property damage). "Judicial hostility to the use of tort theory to recover purely economic losses predates the twentieth-century battle over product liability. This hostility was motivated primarily by the fear of mass litigation and the concern that traditional tort concepts were not capable of providing clear limitations on potentially limitless liability. Defining the scope of tort duty to include only physical harm created 'built-in' limits on liability, since any given chain of events in the physical world has finite consequences. Permitting plaintiffs to recover for purely economic losses would result in open-ended liability, since it is virtually impossible to predict the economic consequences of a given act." (Barrett, *Recovery of Economic Loss in Tort for Construction Defects: A Critical Analysis* (Summer, 1989) 40 S.C. L.Rev. 891, 898, fns. omitted.)[9]

However, as we explain, the economic loss rule has not been applied in California to limit a plaintiff's tort damages in all cases. The question of whether a plaintiff may recover damages for economic loss, absent physical injury to person or property, has been answered differently in cases involving the quality and condition of goods from when plaintiff's loss arises from a negligent performance of services.

---

[8] The term "economic loss" has been defined as " ' "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits—without any claim of personal injury or damages to other property . . . ." ' [Citations.]" (*Sacramento Regional Transit Dist. v. Grumman Flxible* (1984) 158 Cal.App.3d 289, 294 [204 Cal.Rptr. 736].) One commentator defines purely economic loss as "the financial harm arising out of wrongful interference with plaintiff's contractual relations or with his or her noncontractual prospective gain." (Rizzo, *A Theory of Economic Loss in the Law of Torts* (1982) 11 J. Legal Stud. 281, 281.) Although purely economic loss usually occurs in the form of lost profits, it may also include consequential damages, loss of expected proceeds, lost opportunities, diminution in the value of the allegedly defective property, the costs of repair and replacement, loss of use, loss of goodwill, and damages paid to third parties as a result of a defendant's negligence. (Segalla & Nowak, *Economic Loss Rule: Foreseeability—Dialogue of the 90's?* (Fall, 1994) 45 Fed'n. of Ins. & Corp. Couns. Q. 25, 26.)

[9] This judicial reluctance is well illustrated by two older cases decided in other jurisdictions, which denied liability in negligence for economic losses to "remote" plaintiffs. (*Stevenson v. East Ohio Gas Co.* (1946) 47 Ohio Law Abs. 586 [73 N.E.2d 200, 202-204]; *Ultramares Corporation v. Touche* (1931) 255 N.Y. 170, 179-180 [174 N.E. 441, 444-445, 74 A.L.R. 1139].)

### a. *Economic Loss Rule in Cases Involving the Sale of Goods or Products*

In the leading case of *Seely* v. *White Motor Co.* (1965) 63 Cal.2d 9 [45 Cal.Rptr. 17, 403 P.2d 145], the Supreme Court held that a manufacturer of a truck may be held strictly liable for physical injuries caused to person or property, but not for purely economic losses. (*Id.* at pp. 18-19.)[10] The *Seely* court held that contract and warranty law should govern the economic relationship between a buyer and a seller and between a manufacturer and a consumer. While the doctrine of strict liability in tort is properly extended to govern physical damage to a buyer's and a consumer's property as well as any personal injury caused by the product, it cannot be extended to cover a purely economic loss. (*Ibid.*)

The court explained its reasoning in the following terms: "The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in

---

[10]In *Seely*, plaintiff had purchased a truck from the defendant manufacturer for use in his business of heavy-duty hauling. He sued the defendant for damages resulting from an accident allegedly caused by a defect in the manufacture of the truck which had caused it to bounce heavily or "gallop." Plaintiff was not injured in the accident but the truck was damaged in the approximate sum of $5,500. Plaintiff sought recovery of not only this sum, but also the amount which he had paid towards the purchase price and the lost profits he would have otherwise earned if he had been able to make normal use of the truck. The trial court found that plaintiff had failed to prove that the "galloping" condition had caused the accident and therefore denied recovery for the truck repairs; however, the court did award plaintiff his claimed economic damages based upon the defendant's breach of warranty. The Supreme Court held that such an award "was proper on the basis of a breach of express warranty" (*Seely* v. *White Motor Co., supra,* 63 Cal.2d at p. 13) and affirmed the judgment of the trial court. In doing so, it discussed the legal issues relevant to the case before us in response to the defendant's argument that the law of sales and warranty, spelled out in the Uniform Commercial Code, had been superseded by the doctrine of strict liability in tort set forth in *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]. (63 Cal.2d at pp. 15-19.)

actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone. [Citations.]" (*Seely* v. *White Motor Co.*, *supra*, 63 Cal.2d at p. 18.)[11]

Although negligence was not an issue in *Seely*, the court purported to extend its limitation on recovery of economic losses to that theory as well. This, of course, was only dicta. Nonetheless, other courts have applied the rule. In *S. M. Wilson & Co.* v. *Smith Intern., Inc.* (9th Cir. 1978) 587 F.2d 1363, the court concluded that an aggrieved buyer's rights should be limited to those provided by the Uniform Commercial Code. "Where the suit is between a non-performing seller and an aggrieved buyer and the injury consists of damage to the goods themselves and the costs of repair of such damage or a loss of profits that the deal had been expected to yield to the buyer, it would be sensible to limit the buyer's rights to those provided by the Uniform Commercial Code. . . . Whether the complaint is cast in terms of strict liability in tort or negligence should make no difference." (*Id.* at p. 1376.) On the other hand, one California court has focused on the fact that the recoverability of pure economic losses under a *negligence* theory was not before the court in *Seely* and perhaps that decision should not be so construed. (*Ales-Peratis Foods Internat., Inc.* v. *American Can Co.* (1985) 164 Cal.App.3d 277, 282-285 [209 Cal.Rptr. 917] [relying on an analysis, which recognized a sharp distinction between actions based on negligence and strict liability, by the Washington Supreme Court in *Berg* v. *General Motors Corporation* (1976) 87 Wn.2d 584 [555 P.2d 818, 822-823]].) However, this comment by the *Ales-Peratis* court was also dicta as it did not reach that issue either, but decided the case before it on other grounds. (164 Cal.App.3d at p. 285.) Moreover, while our Supreme Court has never applied the *Seely* dictum in a negligence cause of action, a number of appellate courts have. (See, e.g., *Sacramento Regional Transit Dist.* v. *Grumman Flxible*, *supra*, 158 Cal.App.3d at p. 298; *Anthony* v. *Kelsey-Hayes Co.*, *supra*, 25 Cal.App.3d at pp. 446-447.)

One of the cases applying the *Seely* rule went so far as to hold that the strict liability doctrine should not apply at all where sophisticated parties have the ability to allocate risks and avail themselves of the rights and

---

[11]The general rules discussed in *Seely* have been applied in a number of subsequent cases. (*Cronin* v. *J. B. E. Olson Corp.* (1972) 8 Cal.3d 121, 130 [104 Cal.Rptr. 433, 501 P.2d 1153]; *Fieldstone Co.* v. *Briggs Plumbing Products, Inc.* (1997) 54 Cal.App.4th 357, 366 [62 Cal.Rptr.2d 701]; *San Francisco Unified School Dist.* v. *W.R. Grace & Co.* (1995) 37 Cal.App.4th 1318, 1327-1329 [44 Cal.Rptr.2d 305]; *Sacramento Regional Transit Dist.* v. *Grumman Flxible*, *supra*, 158 Cal.App.3d at p. 298; *Rodrigues* v. *Campbell Industries* (1978) 87 Cal.App.3d 494, 498 [151 Cal.Rptr. 90]; *Anthony* v. *Kelsey-Hayes Co.* (1972) 25 Cal.App.3d 442, 446-447 [102 Cal.Rptr. 113].)

remedies under commercial law.[12] The court reasoned that to permit contract claims to masquerade as product liability torts would effectively frustrate the statutory rules established in the Commercial Code. (*Kaiser Steel Corp.* v. *Westinghouse Elec. Corp.* (1976) 55 Cal.App.3d 737, 747-748 [127 Cal.Rptr. 838].) Under *Kaiser*, strict liability would be foreclosed "as between parties who: (1) deal in a commercial setting; (2) from positions of relatively equal economic strength; (3) bargain the specifications of the product; and (4) negotiate concerning the risk of loss from defects in [the product.] [Citation.]" (*Id.* at p. 748.) Subsequent decisions have held that *actual* bargaining about risk allocation would not be required; it would be enough if the parties were so situated that they *could* have bargained on the issue. (*International Knights of Wine, Inc.* v. *Ball Corp.* (1980) 110 Cal.App.3d 1001, 1007, fn. 1 [168 Cal.Rptr. 301]; *S. A. Empresa, etc.* v. *Boeing Co.* (9th Cir. 1981) 641 F.2d 746, 754.)

■ From all of these cases, we conclude that in actions arising from the sale or purchase of a defective product, plaintiffs seeking economic losses must be able to demonstrate that either physical damage to property (other than the defective product itself) or personal injury accompanied such losses; if they cannot, then they would be precluded from any tort recovery in strict liability or negligence. However, such authorities would seem to have little or no application when the commercial relationship of the parties does not involve the sale of goods or products, nor the rules developed under the law merchant and the Uniform Commercial Code, but rather relates only

---

[12]California Uniform Commercial Code sections 2718 and 2719 expressly anticipate and provide for damage negotiation between the parties to contracts involving the sale of goods:

Section 2718 provides, in pertinent part:

"(1) Damages for breach by either party may be liquidated in the agreement subject to and in compliance with Section 1671 of the Civil Code. If the agreement provides for liquidation of damages and such provision does not comply with Section 1671 of the Civil Code, remedy may be had as provided in this division."

Section 2719 provides:

"(1) Subject to the provisions of subdivisions (2) and (3) of this section and of the preceding section on liquidation and limitation of damages,

"(a) The agreement may provide for remedies in addition to or in substitution for those provided in this division and may limit or alter the measure of damages recoverable under this division, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and

"(b) Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

"(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this code.

"(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is invalid unless it is proved that the limitation is not unconscionable. Limitation of consequential damages where the loss is commercial is valid unless it is proved that the limitation is unconscionable."

to the performance of services. It is established that where the commercial agreement between the parties involves the performance of services, the Commercial Code has no application. (See, e.g., *Sacramento Regional Transit Dist.* v. *Grumman Flxible, supra,* 158 Cal.App.3d at pp. 299-300; *LAVWMA* v. *Northwest Pipe & Casing Co.* (N.D.Cal. 1995) 915 F.Supp. 1066, 1072-1074; *Frank M. Booth, Inc.* v. *Reynolds Metals Co.* (E.D.Cal. 1991) 754 F.Supp. 1441, 1449-1450.) ▮ Thus, in circumstances such as those presented by this case, the policy concerns underlying the limitations on recovery of economic losses articulated by the *Seely* court and its progeny are not present. As a result, when the contract relates to the performance of services there is a different rule supported by an entirely different line of cases. (See *Huang* v. *Garner* (1984) 157 Cal.App.3d 404, 421-423 [203 Cal.Rptr. 800], and cases cited therein.) Again, a Supreme Court decision, articulating a new legal principle, led the way.

### b. *Economic Loss Rule in Cases Involving the Performance of Services*

In *J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799 [157 Cal.Rptr. 407, 598 P.2d 60] (*J'Aire*), the court had before it the claim of a plaintiff lessee who had no contractual relationship with the defendant contractor hired by the lessor but whose injury from the defendant's negligence was reasonably foreseeable. The plaintiff sued the defendant for damages resulting from the delay in completion of a construction remodel of the leased premises at the Sonoma County Airport where plaintiff operated its restaurant. Plaintiff's lessor, the County of Sonoma, had entered into a construction contract with the defendant to make certain improvements to the restaurant premises. The contract did not specify a completion date and thus the defendant contractor was required to complete it within a reasonable time. He negligently failed to do so and, as a result, plaintiff suffered a loss of business and profits. Plaintiff filed suit against defendant seeking damages for such economic losses based upon two theories: (1) that plaintiff was a third party beneficiary of the lessor's construction contract with the defendant and the defendant's breach resulted in foreseeable losses to plaintiff, and (2) that defendant was liable in tort for its negligent performance of the contract. The defendant's demurrer was sustained without leave to amend and plaintiff appealed.[13]

The *J'Aire* court first acknowledged the general rules, which we have already discussed, regarding the need for an existing duty of care owed to the plaintiff in order to support an action for negligence and that such a duty

---

[13]For reasons not disclosed in the *J'Aire* opinion, the plaintiff in that case appealed only as to the second cause of action for negligence.

may be created by contract. (*J'Aire, supra,* 24 Cal.3d at p. 803.) The court then discussed the settled rules providing for recovery of economic losses or lost profits as part of the general damages available in a suit for personal injury or property damage. (*Id.* at pp. 803-804.) Such damages, as the *J'Aire* court recognized, necessarily constitute a prospective economic advantage which would have been received by the plaintiff but for the negligent conduct of the defendant. (*Ibid.*) Finally, the *J'Aire* court held that recovery for the loss of such a prospective economic advantage was not foreclosed even if the plaintiff was not a party to the negligently performed contract. █ "Where a special relationship exists between the parties, a plaintiff may recover for loss of expected economic advantage through the negligent performance of a contract although the parties were not in contractual privity." (*Id.* at p. 804, citing *Biakanja* v. *Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358]; *Lucas* v. *Hamm, supra,* 56 Cal.2d 583; and *Heyer* v. *Flaig* (1969) 70 Cal.2d 223 [74 Cal.Rptr. 225, 449 P.2d 161] [which all held that intended beneficiaries of wills could sue to recover legacies lost through the negligent preparation of the will].)

The necessary "special relationship" required by *J'Aire* was established by consideration of six criteria first articulated by the *Biakanja* court: (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing future harm. (24 Cal.3d at p. 804, citing *Biakanja* v. *Irving, supra,* 49 Cal.2d at p. 650.) The *J'Aire* court emphasized that *the foreseeability of the economic harm to the plaintiff from the defendant's negligent conduct was the critical factor.* (24 Cal.3d at pp. 805-806.) The absence of such foreseeability was what distinguished earlier cases which had rejected such a recovery. (*Id.* at pp. 806-807, citing *Fifield Manor* v. *Finston* (1960) 54 Cal.2d 632 [7 Cal.Rptr. 377, 354 P.2d 1073, 78 A.L.R.2d 813] and *Adams* v. *Southern Pac. Transportation Co.* (1975) 50 Cal.App.3d 37 [123 Cal.Rptr. 216].) As the court stated: "[T]he factors enumerated in *Biakanja* and applied in subsequent cases place a limit on recovery by focusing judicial attention on the foreseeability of the injury and the nexus between the defendant's conduct and the plaintiff's injury. These factors and ordinary principles of tort law such as proximate cause are fully adequate to limit recovery without the drastic consequence of an absolute rule which bars recovery in all such cases. [Citation.] Following these principles, *recovery for negligent interference with prospective economic advantage will be limited to instances where the risk of harm is foreseeable and is closely connected with the defendant's conduct, where damages are not wholly speculative and the injury is not part of the plaintiff's ordinary business risk.*" (24 Cal.3d at p. 808, italics added.)

In addition, *J'Aire* expressly held that the prospective economic damages claimed by a plaintiff need *not* be accompanied by personal injury or property damage in order to be recoverable. Noting that every person is responsible for the injuries caused by his or her lack of ordinary care (Civ. Code, § 1714), the court saw no reason to distinguish between different types of damage. "[Section 1714] does not distinguish among injuries to one's person, one's property or one's financial interests. Damages for loss of profits or earnings are recoverable where they result from an injury to one's person or property caused by another's negligence. *Recovery for injury to one's economic interests, where it is the foreseeable result of another's want of ordinary care, should not be foreclosed simply because it is the only injury that occurs.*" (24 Cal.3d at p. 806, italics added.)

Subsequent cases have extended the application of *J'Aire* to cases where the parties are in contractual privity. (*Ott* v. *Alfa-Laval Agri, Inc.* (1995) 31 Cal.App.4th 1439, 1448 [37 Cal.Rptr.2d 790]; *Pisano* v. *American Leasing* (1983) 146 Cal.App.3d 194, 197 [194 Cal.Rptr. 77].) As the *Ott* court put it, ". . . the reasoning of *J'Aire* is wholly incompatible with a limitation of the cause of action to those instances in which the plaintiff and defendant are not in privity, . . ." (*Ott* v. *Alfa-Laval Agri, Inc., supra*, 31 Cal.App.4th at p. 1448.)[14] We agree, at least in those cases involving contracts for services.

Lending some confusion to this area of the law are those decisions which have applied or discussed the principles set out in *J'Aire* in the context of a claim for defective goods or products. However, in each of those cases, the plaintiff was *not* in contractual privity with the defendant (see, e.g., *Zamora* v. *Shell Oil Co.* (1997) 55 Cal.App.4th 204, 209-213 [63 Cal.Rptr.2d 762]; *Fieldstone Co.* v. *Briggs Plumbing Products, Inc., supra*, 54 Cal.App.4th at pp. 363-369; *Ott* v. *Alfa-Laval Agri, Inc., supra*, 31 Cal.App.4th at p. 1448; *Ales-Peratis Foods Internat., Inc.* v. *American Can Co., supra*, 164 Cal.App.3d at pp. 285-268, 289-290; *Huang* v. *Garner, supra*, 157 Cal.App.3d at pp. 420-423) or there was evidence of some physical harm suffered by the plaintiff (see, e.g., *Pisano* v. *American Leasing, supra*, 146 Cal.App.3d at pp. 196-197). In our view, where there is contractual privity in cases involving the quality of condition of goods or products, and the transaction is governed by the provisions of the Commercial Code, there is, as we have already explained, no room for the expanded liability which results from the application of *J'Aire*. (See *LAVWMA* v. *Northwest Pipe & Casing Co., supra*, 915 F.Supp. at pp. 1072-1073; *Frank M. Booth, Inc.* v.

---

[14]We recognize that this statement by the *Ott* court was dicta since there was no contractual privity in that case. Plaintiff had purchased the allegedly defective milking systems manufactured by the defendants from a local independent distributor. Nonetheless, for the reasons set out herein, we believe the observation by the *Ott* court is a correct one.

*Reynolds Metals Co., supra,* 754 F.Supp. at p. 1449-1450.)[15] Thus, we assume, without having to decide, that *J'Aire* could properly be applied in a goods or products case only when there is an *absence* of privity. However, in cases where economic loss has resulted from the negligent performance of services, such as the case before us, we agree with the conclusion expressed by the *Ott* court that "absence of a contract remedy [is not] a requisite." (*Ott* v. *Alfa-Laval Agri, Inc., supra,* 31 Cal.App.4th at p. 1454.)

As the California Supreme Court emphasized in *J'Aire,* the critical issue to be determined before allowing recovery of an economic loss is the foreseeability of the risk of that loss flowing from a defendant's negligent conduct. In cases involving the negligent performance of services, it would seem to matter little whether that foreseeability is established, at least in part, by a contractual relationship. It is the foreseeability of the economic loss resulting from the defendant's conduct, not the plaintiff's inability to contractually anticipate and provide for such loss, which serves as the foundation for imposition of liability. Moreover, the emphasis placed on the ability of contracting parties to allocate the risk of economic loss in the context of the sale or distribution of goods has no logical application here. No party contracting for the services of another need negotiate with the other regarding the latter's burden to perform the contract reasonably and competently. Absent an express contractual provision to the contrary, such burden is already imposed by law upon the performing party and, as we have shown, enforced in tort with a more expansive measure of damages. Thus, a plaintiff has no reason to bargain for a standard of performance already imposed by law and, absent very unusual circumstances, is not likely to agree to accept the risk of a defendant's negligent performance when the defendant's reasonable and competent performance is the whole purpose of the contract and is a necessarily implied covenant therein. Obviously, in a contract for the

---

[15]As the *Kaiser* court explained in setting forth its four-part test for restricting the application of the strict liability doctrine, "Because the California rule of products liability is designed to encompass situations in which the principles of sales warranties serve their purpose 'fitfully at best,' the rule of products liability does not subsume the entire area of a manufacturer's liability for a defective product. [Citation.] '[T]he adequacy of sales law controls the use of tort law, since the need to resort to tort law depends upon the extent to which sales law does or does not afford protection to a disappointed buyer.' [Citations.] [¶] . . . [¶] . . . Since the specifications of the product are negotiable, the tort doctrine of products liability as between the buyer and seller is no inducement to design and produce a safe product. Since the manufacturer and buyer have bargained in a commercial setting not only for the product but also for the measure and mode of reimbursement for defects in the product, any societal interest in loss shifting is absent. Whether the loss is thrust initially upon the manufacturer or customer, it is ultimately passed along as a cost of doing business included in the price of the products of one or the other and thus spread over a broad commercial stream. [Citation.]" (*Kaiser Steel Corp.* v. *Westinghouse Elec. Corp., supra,* 55 Cal.App.3d at pp. 747-748.)

performance of services, any reallocation of economic losses away from the negligently performing defendant would, in all but the most unusual case, defeat the contract's purpose.

A contract for the performance of services, as we have already discussed, necessarily carries with it both the reasonable expectation and implied at law promise that it will be performed with reasonable care. Thus, in negligent performance cases, the reasoning of *J'Aire* and the six criteria on which it relies will determine the existence of the necessary special relationship and it does not matter whether the plaintiff and defendant are in privity or not. In addition, if those six criteria are satisfied the plaintiff will be entitled to recover economic loss damages without the need to allege and prove personal injury or property damage.

### 4. *North American Is Entitled to Recover for Its Claimed Economic Loss.*

 In sustaining Harbor Pac's demurrer to North American's negligence cause of action, the trial court appeared to focus on the fact that, unlike the *Allred* case, as well as *Eads* v. *Marks*, where the plaintiff's claim in each case was for personal injury and/or property damage, this case involves solely an *economic loss*.[16] North American seeks to recover the $203,550 that it agreed to pay to its customer NHT for damages which NHT sustained as a result of injury to *its* business and economic interests following its use of the contaminated boric acid.

We have already concluded that Harbor Pac's contract with North American imposed a legal duty on Harbor Pac to perform that contract with due

---

[16]The trial court explained its view in the following terms: "[It] seems to me that what you're really asking for is interference with prospective economic advantage, and I think that you're just bound by your contract terms. And certainly you have your contract cause of action, and you're entitled to your damages for breach there . . . [¶] . . . [¶] The bottom line, counsel, this is a contract cause of action. There's clearly a breach alleged. That breach, if proven, is going to give rise to the damages in the amount of money that was put out of pocket by [North American]. As a result of the alleged breach. [¶] It just seems to me that the cause of action is properly pled and properly before the court as contract cause of action, not the tort cause of action. [¶] The demurrer will be sustained without leave to amend."

However, it is not at all clear that the damages allowable for a breach of contract would necessarily include the very substantial damages which North American alleges it had to pay to NHT. Depending on the resolution of such issues as the parties' knowledge and reasonable expectations at the time of the North America/Harbor Pac contract and the then-foreseeable harm which could reasonably flow from breach (i.e., the standard for measuring contract damages under Civil Code section 3300), such damages might well be limited to the contract price or the market value of the damaged boric acid (less its salvage value, if any). As we have pointed out, North American contends that such a limited measure of damages would not result in full compensation for Harbor Pac's allegedly wrongful conduct.

care. Its alleged failure to do so was a breach of that legal duty giving North American a remedy in tort as well as contract. Thus, a tort measure of damages is necessarily applicable to North American's claim. Tort damages are awarded to compensate a plaintiff for *all* of the damages suffered as a legal result of the defendant's wrongful conduct. Civil Code section 3333 defines the standard by which such damages are measured: "For the breach of an obligation not arising from contract, the measure of damages . . . is *the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.*" (Italics added.)

Every person is responsible for injuries caused by his or her lack of ordinary care. (Civ. Code, § 1714.) As we have already noted, the *J'Aire* court held, "That section does not distinguish among injuries to one's person, one's property or one's financial interests. . . . Recovery for injury to one's economic interests, *where it is the foreseeable result of another's want of ordinary care, should not be foreclosed simply because it is the only injury that occurs.*" (*J'Aire, supra,* 24 Cal.3d at p. 806, italics added.)

That same principle applies with equal force here. It is true that North American did not expressly articulate a negligent interference cause of action in its complaint, but rather alleged only a cause of action for negligence based upon a duty arising from Harbor Pac's contractual obligation. However, it has alleged (or apparently can allege) sufficient facts to state such a cause of action. ■ In reviewing the trial court's ruling on a demurrer, we are not bound by the label attached to a cause of action by the pleader; rather, we examine the factual allegations to determine whether a cause of action is (or can be) stated on *any* available legal theory. (*Ellenberger* v. *Espinosa, supra,* 30 Cal.App.4th at p. 947; *Saunders* v. *Cariss, supra,* 224 Cal.App.3d at p. 908.)

■ The tort of negligent interference with prospective economic advantage is established where a plaintiff demonstrates that (1) an economic relationship existed between the plaintiff and a third party which contained a reasonably probable future economic benefit or advantage to plaintiff; (2) the defendant knew of the existence of the relationship and was aware or should have been aware that if it did not act with due care its actions would interfere with this relationship and cause plaintiff to lose in whole or in part the probable future economic benefit or advantage of the relationship; (3) the defendant was negligent; and (4) such negligence caused damage to plaintiff in that the relationship was actually interfered with or disrupted and plaintiff lost in whole or in part the economic benefits or advantage reasonably expected from the relationship. (See 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 661-662, pp. 755-758; BAJI No. 7.82.1.)

■ The six criteria set forth in *J'Aire*, which justify recovery of economic loss caused by the negligent performance of a contract, are certainly met in this case. In its second amended complaint, North American has alleged facts (or claims it can do so) which plainly show that (1) Harbor Pac's performance of its packaging and shipping contract was expressly intended to affect North American—the purpose of such performance was to facilitate a sale of North American's product to its Japanese customer; (2) if Harbor Pac did not perform that contract properly there was a reasonably foreseeable harm to North American's economic interests—indeed, the delivery of contaminated boric acid to Japan would have an immediate and predictable negative impact on North American's relationship with its Japanese customer; (3) North American clearly suffered injury here as it was allegedly required to make good on the damage done to its customer's business and economic interests by reason of Harbor Pac's negligent conduct; (4) the injury resulted directly from Harbor Pac's negligent acts; (5) whether or not moral blame could be placed on Harbor Pac, its wrongful conduct was plainly responsible for the loss suffered by North American; and finally, (6) future harm to others can clearly be avoided by enforcement of a rule that imposes a burden of due care on all persons in the performance of their contractual undertakings. (See *Chameleon Engineering Corp.* v. *Air Dynamics Inc.* (1980) 101 Cal.App.3d 418, 423 [161 Cal.Rptr. 463].)

The satisfaction of these factors is sufficient to demonstrate a "special relationship" between North American and Harbor Pac thereby creating a basis for liability even in the absence of other injury or contractual privity. As we have explained, the fact that there is privity here provides no reason not to apply the same standards to this case. *J'Aire* and the cases following it consistently permit recovery even when the *only* injury claimed or proven is economic loss, and the absence of a contract remedy is not a prerequisite.

## CONCLUSION

North American has alleged sufficient facts to demonstrate that Harbor Pac had a legal duty to perform its contract in a reasonable and competent manner and that it negligently failed to do so. In addition, it has also alleged (or asserts it can allege) facts demonstrating the existence of the special relationship defined and required by *J'Aire* so as to justify the recovery of the economic losses which it claims legally resulted from Harbor Pac's negligent acts. Whether North American can prove such facts or whether it legally suffered a loss in the amount alleged, or at all, or acted as a volunteer in agreeing to pay NHT's claim, or whether NHT's claimed losses can be substantiated or were in fact due to the acts or omissions of Harbor Pac, are

all questions which remain to be resolved in the trial court. All we decide is that North American is entitled to pursue its claims of negligence and/or negligent interference with prospective economic advantage and the trial court's order sustaining Harbor Pac's demurrer *without* leave to amend was error.

DISPOSITION

The alternative writ is discharged. Let a peremptory writ issue directing the trial court to (1) vacate its order of December 31, 1996, sustaining the demurrer to the third cause of action of North American's second amended complaint, and (2) enter a new and different order sustaining the demurrer *with* leave to amend and to conduct further proceedings consistent with the views expressed herein. North American shall recover its costs on appeal.

Kitching, J., and Aranda, J.,* concurred.

*Judge of the Municipal Court for the South Bay Judicial District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.